FILED
MAR 7 2005
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

Civil Action No.

RICHMOND AMERICAN HOMES OF COLORADO, INC., METROPOLITAN DEVELOPMENT IV, LLC, METROPOLITAN BUILDERS, INC., STANDARD PACIFIC OF COLORADO, INC., and TOUCHSTONE HOMES, LLC

Plaintiffs,

v.

05- 280L

THE UNITED STATES OF AMERICA and THE UNITED STATES DEPARTMENTS OF DEFENSE AND AIR FORCE,

Defendants.

05 MAR -8 AM 10:43
DEPARTMENT OF JUSTICE GENERAL LITIGATION SECTION

**COMPLAINT**

Richmond American Homes of Colorado, Inc. ("Richmond"), Metropolitan Development IV, LLC ("Metropolitan Development"), Metropolitan Builders, Inc. ("Metropolitan Builders") (collectively referred to as "Metropolitan"), Standard Pacific of Colorado, Inc. ("Standard Pacific"), and Touchstone Homes, LLC ("Touchstone Homes") (hereinafter all of the plaintiffs are collectively referred to as the "Plaintiffs"), by and through undersigned counsel, hereby files this Complaint as follows:

**STATEMENT OF THE CASE**

1. This is a civil action against the United States, the Department of Defense ("DOD") and the U.S. Air Force (the "Air Force") (collectively referred to as the "Defendants") for failing to fulfill their obligations under § 330 of the National Defense Authorization Act for Fiscal Year 1993, Pub. L. 102-484, Div. A, Title III, § 330, (Oct. 23, 1992), as amended, Pub. L.

103-60, Div. A, Title X, § 1002 (Nov. 30, 1993) (hereinafter referred to as "§ 330") and for breaching deed covenants made pursuant to § 120(h) of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9620(h) (hereinafter referred to as "CERCLA § 120(h)").

2. Plaintiffs bring this action to recover from the Defendants all costs and fees they have incurred as a result of releases of hazardous substances on lots they own or owned on the former Lowry Air Force Base ("LAFB") (Plaintiffs' lots are hereinafter collectively referred to as the "Properties"), including costs of investigating and removing said hazardous substances on the Properties, lost profits and other costs incurred due to delayed construction and home sales on the Properties, and legal fees.

3. Plaintiffs also seek a declaration that Defendants are jointly and severally liable for all past and future costs incurred by Plaintiffs as a result of said releases or threatened releases of hazardous substances at or from the Properties, and that Defendants are responsible for compliance with all requirements of § 330 and CERCLA § 120(h) in the future.

**JURISDICTION**

4. This Court has jurisdiction over this action pursuant to the Tucker Act because the claims asserted herein are for money damages arising under an "Act of Congress" and "upon [an] express . . . contract with the United States." 28 U.S.C. § 1491.

5. Defendants have waived any claim they might have that this Court lacks jurisdiction over them for the resolution of the claims raised in this Complaint pursuant to § 330 and 28 U.S.C. § 1491.

6. Defendants have also waived sovereign immunity under the Tucker Act, 28 U.S.C. § 1491, for claims brought against them in this Court.

7. Defendants have further waived sovereign immunity under § 330 and CERCLA § 120 for claims of liability brought thereunder.

**PARTIES**

8. Richmond is a Delaware corporation with its principal place of business in Colorado.

9. Metropolitan Development is a Colorado limited liability company, with its principal place of business in Colorado.

10. Metropolitan Builders is a Colorado corporation, with its principal place of business in Colorado.

11. Standard Pacific, formerly known as The Writer Corporation, is a Delaware corporation, with its principal place of business in Colorado.

12. Touchstone Homes, is a Colorado limited liability company, with its principal place of business in Colorado.

13. Defendant the United States is a sovereign nation, acting for itself, and by and through DOD and/or the Air Force.

14. Defendant DOD is a Department of the United States government.

15. Defendant Air Force is a branch of the U.S. Armed Services and an agency or instrumentality of the United States.

## BACKGROUND

### Historical Background

16. The former Lowry Air Force Base ("LAFB") was established in 1937. It consists of 1,866 acres, approximately 1,633 of which lie within the City and County of Denver. The remaining 233 acres of the base lie within the boundaries of the City of Aurora.

17. From 1937 through September 1994, the Defendants used the LAFB for multiple purposes, including an active Air Force base, flight training, aircraft maintenance, operation of a hospital, classroom instruction, student and family housing and office administration.

18. The United States closed the LAFB in September 1994 pursuant to the Base Realignment and Closure Act of 1990, Pub. L. No. 101-510.

19. In July 1995, one or more of the Defendants transferred ownership of approximately 758 acres of the LAFB to the Lowry Redevelopment Authority (the "LRA").

20. Since that time, the LRA has sold individual parcels and/or larger tracts or blocks to residential homebuilders.

21. One area of the LAFB that was transferred to the LRA and is currently under development for residential use is known as the "Northwest Neighborhood." The Northwest Neighborhood is defined as the area north of 8th Avenue, south of 11th Avenue, west of Uinta Way, and east of Quebec Street in the City and County of Denver. (See map illustrating portion of Northwest Neighborhood attached as Exh. A.)

22. Prior to closure and transfer of the LAFB, the Air Force prepared a document entitled the "1993 Basewide Environmental Baseline Survey" (the "1993 EBS"), which is a survey of the LAFB to document the physical condition of real property at the LAFB prior to the transfer of any of the real property at the LAFB. The 1993 EBS characterized a majority of the Northwest Neighborhood area as a Category 1 area, meaning there was "no evidence of the disposal of hazardous substances or petroleum products" identified in the area. Furthermore, nothing in the 1993 EBS indicated the presence of asbestos in the soil in the Northwest Neighborhood.

23. A team known as the Base Closure Team, which included the Colorado Department of Public Health and Environment ("CDPHE"), the Environmental Protection Agency ("EPA") and the Air Force, was responsible pursuant to federal base closure procedures for evaluating the LAFB, overseeing environmental investigations and cleanup, and deeming property on the LAFB suitable for transfer to the local redevelopment authority. The Base Closure Team reviewed the 1993 EBS and deemed the Northwest Neighborhood area suitable for transfer for future residential use in or around March 1998.

24. Furthermore, in February 1999, 2000 and 2002, the Air Force issued Findings of Suitability for Transfer ("FOST") pursuant to requirements of CERCLA § 120(h), 42 U.S.C. § 9620(h), deeming the Northwest Neighborhood area of the LAFB suitable for transfer for future residential development. (See 1999, 2000 and 2002 FOST documents attached as Exh. B.) CDPHE and EPA approved these FOST documents.

25. A deed transferring property on the LAFB, including portions of the Northwest Neighborhood, to the LRA recorded on February 2, 1999 (hereinafter referred to as the "February 1999 Deed") contains covenants by the Air Force pursuant to CERCLA § 120(h) warranting that (1) all remedial action necessary to protect human health and the environment with respect to hazardous substances identified by the Air Force as remaining on the property had been taken before the date of the conveyance, and (2) any additional remedial action found to be necessary after the date of the conveyance shall be conducted by the United States. (See February 1999 Deed attached hereto as Exh. C).

26. Subsequent deeds amending the February 1999 Deed (the "Amending Deeds") contain similar deed covenants. (See Amending Deeds attached as Exh. D)

27. A deed transferring another section of the Northwest Neighborhood to the LRA on March 28, 2000 (hereinafter referred to as the "March 2000 Deed") also contains a covenant by the Air Force warranting that "any response action or corrective action necessary after the date of this Deed for contamination existing on the Property prior to the date of this Deed shall be conducted by the United States." (A copy of the March 2000 Deed is attached as Exh. E).

28. The covenants in the February 1999 Deed, Amending Deeds and March 2000 Deed are hereinafter collectively referred to as the "Deed Covenants."

**Defendants' Activities in the Northwest Neighborhood**

29. Historically, one or more of the Defendants used the Northwest Neighborhood to house military personnel and, as a result, dormitories and/or barracks buildings (hereinafter referred to as "dormitory buildings") were located in this area. A portion of the Northwest Neighborhood area also contained a 20-building hospital complex. The hospital complex was constructed in 1942 and utilized underground steam lines to heat the facility.

30. The Air Force demolished both the dormitory buildings and the hospital complex sometime between 1959 and 1979.

31. Upon information and belief, during the demolition of the dormitory buildings and the hospital complex, one or more of the Defendants buried asbestos and asbestos-containing material, including asbestos-containing insulation, steam pipes and related building debris, in the soil in the Northwest Neighborhood. The demolition and associated burial of asbestos and asbestos-containing material resulted in contamination of the surface and subsurface soils in the Northwest Neighborhood with asbestos.

32. The specific area of concern for asbestos contaminated soil in the Northwest Neighborhood includes all property north of 8th Avenue, south of 11th Avenue, west of Uinta Way, and east of Quebec Street in the City and County of Denver (hereinafter referred to as the "AOC").

33. Neither the FOST documents nor the deeds transferring the property within the Northwest Neighborhood to the LRA provided any notice of the presence of asbestos or asbestos-containing material in the soils of the Northwest Neighborhood.

**Plaintiffs' Properties**

34. The Plaintiffs' Properties are within the Northwest Neighborhood and, more specifically, within the AOC.

35. Richmond purchased 63 individual lots in the Northwest Neighborhood from the LRA for residential development purposes between June 2001 and December 2002 (the "Richmond Lots"). Specifically, the Richmond Lots are located as follows: Lots 1-20, Block 7, Filing 11; Lots 1-11, Block 5, Filing 11; Lots 1-10 and 12-21; Lots 1-11, Block 1, Filing 15. All of the Richmond Lots lie within the AOC. Richmond has sold all 63 of the Richmond Lots to individual homeowners.

36. Metropolitan Development purchased 52 individual lots in the Northwest Neighborhood from the LRA for residential development purposes between June and December, 2002 (the "Metropolitan Lots"). Specifically, the Metropolitan Lots are located as follows: Lots 1-10 and Lots 12-19, Block 6, Filing 11; Lot 1, Block 7, Filing 9; Lots 1-19, Block 2, Filing 11; and Lots 1-7 and 9-15, Block 2, Filing 15. All of the Metropolitan Lots lie within the AOC. Metropolitan Development has sold all 52 of the Metropolitan Lots to individual homeowners.

37. Standard Pacific purchased 70 individual lots in the Northwest Neighborhood from the LRA for residential development purposes between June 2001 and December 2002 (the

"Standard Pacific Lots"). Specifically, the Standard Pacific Lots are located as follows: Lots 1-14 and 16-24, Block 4, Filing 11; Lots 1-9, Block 8, Filing 11; Lots 9, 10, 12 and 13, Block 9, Filing 11; Lots 1-10 and 23-31, Block 10, Filing 11; and Lots 1-8 and 10-16, Block 13, Filing 11. All of the Standard Pacific Lots lie within the AOC. Standard Pacific has sold 59 of the Standard Pacific Lots to individual homeowners.

38. Touchstone Homes purchased 7 individual lots in the Northwest Neighborhood from the LRA for residential development purposes on December 20, 2002 (the "Touchstone Homes Lots"). Specifically, the Touchstone Homes Lots are located as follows: Lot 6, Block 1, Filing 11; Lot 15, Block 4, Filing 11; Lot 12, Block 5, Filing 11; Lot 11, Block 6, Filing 11; Lot 11, Block 9, Filing 11; Lot 20, Block 11, Filing 11; and Lot 9, Block 13, Filing 11. All of the Touchstone Homes Lots lie within the AOC. Touchstone Homes has sold all 7of the Touchstone Homes Lots to individual homeowners.

39. As part of the Plaintiffs' pre-purchase due diligence evaluation of the Properties, the Plaintiffs reviewed documents prepared by one or more of the Defendants and/or the Base Closure Team, describing the environmental investigation of the LAFB prior to closure of the LAFB. Documents reviewed by the Plaintiffs prior to purchasing the Properties included the FOST documents covering the Properties (Exh. B) and the Deed Covenants (Exhs. C, D and E).

40. The Plaintiffs relied on representations made in these documents in purchasing the Properties, including representations regarding the absence of hazardous substances on the Properties and the suitability of the Properties for future residential use.

41. None of these documents reference any possibility of surface or subsurface asbestos contamination in the soil at the Properties.

**CDPHE's Discovery of Asbestos on the Properties and Demand to Plaintiffs**

42. Plaintiffs were not aware of the possibility that the Properties contained asbestos until after they purchased the Properties.

43. On April 24, 2003, CDPHE issued a Compliance Advisory to the Plaintiffs, the LRA, the U.S. Air Force, and 11 other homebuilders (hereinafter collectively referred to as the "Recipients") to address asbestos contamination in the soils in the Northwest Neighborhood. (A copy of the April 24, 2003 Compliance Advisory is attached as Exh. F.)

44. CDPHE issued a supplemental Compliance Advisory to the Recipients on April 30, 2003, adding a requirement that the Recipients conduct indoor air sampling in the homes already completed in the Northwest Neighborhood. (A copy of the April 30 Compliance Advisory is attached as Exh. G.)

45. In the Compliance Advisories, CDPHE specifically found that conditions in the Northwest Neighborhood, "present a threat to public health and the environment." (Exhs. F and G.) A May 2003 Fact Sheet prepared by CDPHE further provided that "asbestos-containing materials found on the surface of the ground present a potential health risk to people working and living in the Northwest Neighborhood." (May 2003 Fact Sheet attached as Exh. H.)

46. The Compliance Advisories halted all excavation activities in the Northwest Neighborhood, including on the Properties, and required the Recipients to, among other things,

develop and implement 1) an emissions control plan to minimize future emissions of asbestos; 2) sampling plans to characterize the nature and the extent of asbestos contamination in the soils and indoors; and 3) response plans to eliminate potential current and future exposures of people and the environment from asbestos. (Exhs. F and G.)

47. The Compliance Advisories provided that failure to comply with the requirements of the Compliance Advisories could lead to additional enforcement action against the Recipients. (Exhs. F and G.)

48. Pursuant to the Compliance Advisories, CDPHE approved a final indoor air sampling plan on May 19, 2003 (the "Indoor Air Sampling Plan"). (A copy of the Indoor Air Sampling Plan is attached as Exh. I.) CDPHE also approved three final soil sampling work plans to address the various stages of development on the Properties: (1) Sampling Work Plan for Lots or Areas Where Excavation, Grading or Construction has not been Initiated or Completed, approved July 24, 2003; (2) Sampling Work Plan for Landscaped Lots, approved July 24, 2003; and (3) Sampling Work Plan for Lots where Construction is Complete and Bare Soil Exists, approved May 9, 2003 (hereinafter collectively referred to as the "Soil Sampling Work Plans"). (Copies of the Soil Sampling Work Plans are attached as Exh. J.)

49. CDPHE also issued a final response plan on August 15, 2003 (the "Response Plan"). The Response Plan detailed how and to what standard the Plaintiffs were to cleanup asbestos contaminated soils on the Properties. (A copy of the Response Plan is attached as Exh. K.)

50. CDPHE conducted public hearings and received public input on the Response Plan prior to approving the final version of the Response Plan.

51. The Response Plan required that for lots where sampling pursuant to the Soil Sampling Work Plans revealed the presence of asbestos fibers in surface and/or subsurface soils, (a) the Plaintiffs remove up to the top two feet of soil from the lot depending on whether the fibers were found on the surface or below the surface of the lots and, (b) if fibers were found below the surface, the Plaintiffs remove soil to a certain extent below the level where asbestos fibers were detected. (Exh. K.)

52. CDPHE determined that the response actions and clean up standards required by the Response Plan "[were] protective of human health and the environment." (See CDPHE July 2003 Fact Sheet attached as Exh. L.)

**Notice of Claims and Demand to Defendants**

53. The Plaintiffs promptly notified the Defendants in writing of the discovery of asbestos and asbestos-containing material in the soil on the Properties and demanded that Defendants hold harmless, defend and indemnify the Plaintiffs under § 330 against CDPHE's Compliance Advisories and any other demand made against the Plaintiffs as a result of the asbestos and asbestos-containing materials on the Properties. (See Plaintiffs' notice letters attached hereto as Exh. M.)

54. Plaintiffs further demanded that Defendants assume responsibility for asbestos testing and removal in accordance with its obligations under the Deed Covenants, and advised

that if Defendants failed to do so, Plaintiffs would be required to do so to remedy Defendants' breach of the Deed Covenants. (Exh. M).

55. The Defendants refused to take any action to remediate the asbestos contamination on the Properties or to indemnify Plaintiffs for amounts they incurred as a result of the contamination.

56. To address the threat to human health and the environment from the asbestos contamination and to avoid further enforcement action by CDPHE, Richmond, Metropolitan, Standard Pacific, and Touchstone Homes, therefore, began investigation and removal activities on their respective lots pursuant to the Compliance Advisories and Response Plan in August, May, April and October 2003, respectively.

**Costs and Fees Incurred by Plaintiffs**

57. Richmond has completed the requirements of the Compliance Advisories and the Response Plan on all 63 of its lots. Thus far, the investigation and cleanup pursuant to the Compliance Advisories, the Indoor Air Sampling Plan, Soil Sampling Work Plans and the Response Plan has cost Richmond approximately $3,300,000. To date, Richmond has also incurred additional costs and increased expenses of approximately $200,000, including attorneys' fees and costs associated with responding to homeowner demands during the removal action, as a result of the asbestos contamination on the Richmond Lots.

58. Metropolitan has completed the requirements of the Compliance Advisories and the Response Plan on all 52 of its lots. Thus far, the investigation and cleanup pursuant to the

Compliance Advisories, the Indoor Air Sampling Plan, the Soil Sampling Work Plans and the Response Plan has cost Metropolitan approximately $580,000. To date, Metropolitan has also incurred additional costs and increased expenses of approximately $61,000, including attorneys' fees, as a result of the asbestos contamination on the Metropolitan Lots.

59. Standard Pacific has completed the requirements of the Compliance Advisories and the Response Plan for 50 of the 70 lots. Sampling and/or clean up on the remaining 20 lots is in process. Thus far, the investigation and cleanup pursuant to the Compliance Advisories, the Indoor Air Sampling Plan, the Soil Sampling Work Plans and the Response Plan has cost Standard Pacific approximately $1,800,000. To date, Standard Pacific has also incurred additional costs and increased expenses of approximately $200,000, including attorneys' fees and costs of responding to homeowner demands during the removal action, as a result of the asbestos contamination on the Standard Pacific Lots.

60. Touchstone Homes has completed the requirements of the Compliance Advisories and the Response Plan on all of its lots. Thus far, the investigation and cleanup pursuant to the Compliance Advisories, the Indoor Air Sampling Plan, Soil Sampling Work Plans and the Response Plan has cost Touchstone Homes approximately $ 371,500. To date, Touchstone Homes has also incurred additional costs and increased expenses of approximately $3200, including attorneys' fees, as a result of the asbestos contamination on the Touchstone Homes Lots.

**FIRST CLAIM FOR RELIEF**
**(Claim for Costs and Fees Under § 330)**

61. Plaintiffs repeat the allegations of paragraphs 1 through 60, inclusive, as set forth fully herein.

62. Section 330(a)(1) provides, in pertinent part, that:

> Except as provided in paragraph (3) and subject to subsection (b), the Secretary of Defense shall hold harmless, defend and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or a loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance or pollutant or contaminant . . . as a result of Department of Defense activities at any military installation (or portion thereof) that is closed pursuant to a base closure law.

63. The Plaintiffs are persons or entities as described in § 330(a)(2)(C) and (D) in that the Plaintiffs acquired ownership of the Properties from the LRA, which was the immediate transferee of the Properties from the Air Force.

64. The Plaintiffs incurred the costs and fees they seek to recover in this action as a result of a "claim," "demand," or "action" by CDPHE in the form of the Compliance Advisories requiring Plaintiffs to remove asbestos and asbestos-containing material from the Properties or be subject to additional enforcement action. (Exhs. F and G.) Thus, the expenses incurred by the Plaintiffs are the type of costs and fees covered by § 330.

65. Section 330 requires that the covered costs and fees "result from, or [are] in any manner predicated upon, the release or threatened release of any hazardous substance or

pollutant or contaminant." Asbestos is classified as a hazardous substance (as defined by § 101(14) of CERCLA, 42 U.S.C. § 9601(14)), as it is listed as a hazardous substance at 40 C.F.R. § 302.4. Asbestos is also a recognized pollutant and contaminant.

66. The asbestos and asbestos-containing material on the Properties is the result of the Defendants' activities at the LAFB.

67. The LAFB meets the definition of a "military installation," as defined by § 330(f)(2).

68. The United States closed the LAFB pursuant to the Base Realignment and Closure Act of 1990, Pub. L. No. 101-510 (hereinafter referred to as "BRAC"), which is one of the laws specifically listed within the § 330(f)(3) definition of a "base closure law."

69. Section 330(b) requires that an entity seeking costs and fees under § 330 notify DOD in writing within two years after such claim accrues, furnish copies of any pertinent papers received and evidence or proof of any claim, and provide DOD access to its records and personnel for purposes of defending or settling the claim or action.

70. As set forth in paragraphs 53-56 supra, the Plaintiffs notified the Defendants promptly after its discovery of the asbestos and asbestos-containing material on its Properties and demanded that the Defendants indemnify, hold harmless and defend Plaintiffs against the Compliance Advisories and any other demands arising out of the asbestos and asbestos-containing material on the Properties. Plaintiffs also provided the Defendants with copies of the Compliance Advisories and other pertinent documents related to its claims and otherwise fully

informed the Defendants of its claims during extensive meetings and correspondence with the Defendants.

71. Plaintiffs have met all conditions precedent to recovery under § 330.

72. The Defendants failed and refused to take any action to defend Plaintiffs against the Compliance Advisories, thereby, forcing Plaintiffs to comply with CDPHE's demands.

73. As a result, the Defendants are responsible pursuant to § 330 for indemnifying Plaintiffs for all costs and fees incurred as a result of CDPHE's demands arising out of the release of asbestos and asbestos-containing material on the Properties.

**SECOND CLAIM FOR RELIEF**
**(Claim for Breach of Covenants)**

74. Plaintiffs repeat the allegations of paragraphs 1 through 73, inclusive, as set forth fully herein.

75. Pursuant to the Deed Covenants, Defendants were obligated to undertake any "additional remedial action found to be necessary" after the date of transfer of the Properties to the LRA. (Exhs. C, D, and E.)

76. The Plaintiffs are beneficiaries of the Deed Covenants as successors in title to the Properties.

77. As set forth above, the Plaintiffs notified Defendants that "additional remedial action [was] found to be necessary" by CDPHE. (See supra paragraphs 45 and 52 and Exhs. F, G, H and L.)

78. Plaintiffs further demanded that Defendants assume responsibility for asbestos testing and removal pursuant to its obligations under the Deed Covenants, and that if Defendants failed to do so, Plaintiffs would be required to do so to remedy Defendants' breach of the Deed Covenants.

79. The Defendants failed to fulfill any of their responsibilities under the Deed Covenants.

80. As a result of Defendants breach of the Deed Covenants, Plaintiffs have incurred costs and fees as set forth in paragraphs 57-60 supra.

81. Plaintiffs, therefore, are entitled to recover all of their costs and fees arising out of Defendants breach of the Deed Covenants.

WHEREFORE, Plaintiffs pray that this Court:

A. Enter judgment in favor of Plaintiffs and against the Defendants with respect to Plaintiffs' claims;

B. Order Defendants to pay Plaintiffs' costs and fees as provided in § 330 (with interest thereon from the date of expenditure);

C. Order Defendants to pay Plaintiffs' costs and fees arising from Defendants' breach of the Deed Covenants (with interest thereon from the date of expenditure);

D. Enjoin Defendants to comply with the requirements of § 330 and CERCLA § 120(h) in the future;

E. Award Plaintiffs their costs and expenses incurred in litigating these claims, including expert witness fees and costs of investigation, reasonable attorneys' fees and pre-judgment, monetary, and post judgment interest at the maximum lawful rate;

F. Award such other and further relief as this Court deems just and equitable.

Respectfully submitted this 4th day of March, 2005.

Hubert A. Farbes, Jr.
Mark J. Mathews
Michelle C. Kales
BROWNSTEIN HYATT & FARBER, P.C.
410 Seventeenth Street
Twenty-Second Floor
Denver, Colorado 80202-4437
Telephone: 303.223.1100

Attorneys for the Plaintiffs

Plaintiff's Addresses:

Richmond American Homes of Colorado, Inc.
3600 S. Yosemite Street, Suite 900
Denver, CO 80237

Metropolitan Development IV, LLC
Metropolitan Builders, Inc.
2696 S. Colorado Blvd., Suite 430
Denver, CO 80222

Standard Pacific of Colorado, Inc.
4600 South Syracuse Street, Suite 400
Denver, CO 80237

Touchstone Homes, LLC
390 Union Blvd., Suite 580
Lakewood, CO 80228

9205\2\890584.3

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

Civil Action No.

RICHMOND AMERICAN HOMES OF COLORADO, INC., METROPOLITAN DEVELOPMENT IV, LLC, METROPOLITAN BUILDERS, INC., STANDARD PACIFIC OF COLORADO, INC., and TOUCHSTONE HOMES, LLC

Plaintiffs,

v.

THE UNITED STATES OF AMERICA and THE UNITED STATES DEPARTMENTS OF DEFENSE AND AIR FORCE,

Defendants.

---

**INDEX OF EXHIBITS TO COMPLAINT**

---

| TAB NO. | DESCRIPTION |
|---|---|
| A | Map illustrating portion of Northwest Neighborhood |
| B | February 1999, 2000 and 2002 Findings of Suitability for Transfer ("FOST") issued by the Air Force |
| C | February 2, 1999 deed transferring property on the LAFB, including portions of the Northwest Neighborhood, to the LRA |
| D | Subsequent deeds amending the February 1999 Deed |
| E | March 28, 2000 deed transferring another section of the Northwest Neighborhood to the LRA |
| F | April 24, 2003 Compliance Advisory issued by CDPHE to Plaintiffs, LRA, U.S. Air Force, and 11 homebuilders re asbestos contamination in the soils in the Northwest Neighborhood |
| G | April 30, 2003 supplemental Compliance Advisory issued by CDPHE to Plaintiffs, LRA, U.S. Air Force, and 11 homebuilders |
| | |



9205\2\899712.1

| | |
|---|---|
| H | May 2003 Fact Sheet prepared by CDPHE |
| I | May 19, 2003 final indoor air sampling plan approved by CDPHE |
| J | Three final soil sampling work plans approved by CDPHE: (1) Sampling Work Plan for Lots or Areas Where Excavation, Grading or Construction has not been Initiated or Completed, approved July 24, 2003; (2) Sampling Work Plan for Landscaped Lots, approved July 24, 2003; and (3) Sampling Work Plan for Lots where Construction is Complete and Bare Soil Exists, approved May 9, 2003 |
| K | August 15, 2003 Final Response Plan issued by CDPHE |
| L | July 2003 Fact Sheet prepared by CDPHE |
| M | Notice letters from Plaintiffs to Defendants |