# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOWRY ECONOMIC REDEVELOPMENT AUTHORITY, | ) | |
| Plaintiff, | ) | Case No. 06-75 C |
| v. | ) | Judge Wheeler |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

SHERMAN & HOWARD L.L.C.
Durward E. Timmons
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO 80903
Phone: 719-475-2440
Fax: 719-635-4576

Attorneys for Plaintiff

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND....1
II. RELATED CASES....2
III. STATEMENT OF RELEVANT FACTS....7
IV. ARGUMENT....13
A. SUMMARY JUDGMENT STANDARD....13
B. COLLATERAL ESTOPPEL....14
C. STATUTORY OVERVIEW OF § 330....20
D. PLAINTIFF IS ENTITLED TO INDEMNITY UNDER THE PROVISIONS OF SECTION 330....21
1. PLAINTIFF IS A QUALIFIED ENTITY UNDER § 330(A)(2)(D)....21
2. PLAINTIFF SEEKS INDEMNIFICATION FROM AND AGAINST A SUIT, CLAIM, DEMAND OR ACTION, LIABILITY, JUDGMENT, COST, OR OTHER FEES ARISING OUT OF A CLAIM FOR PROPERTY DAMAGE....22
(i). The Compliance Advisories Constitute "Claims" Pursuant to §330(a)(1)....22
(ii). The Compliance Advisories are Claims for "Property Damage" Pursuant to Section 330(a)(1)....25
3. THE CLAIMS RESULTED FROM THE RELEASE OR THREATENED RELEASE OF A HAZARDOUS SUBSTANCE, POLLUTANT, OR CONTAMINANT AS A RESULT OF DEFENDANT'S ACTIVITIES....28
4. PLAINTIFF SATISFIED THE PROCEDURAL REQUIREMENTS OF § 330(B)....31

## TABLE OF AUTHORITIES

### FEDERAL STATUTES AND REGULATIONS

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601(14)(A)....29

CERCLA, 42 U.S.C. § 9601(22)....29

CERCLA, 42 U.S.C. § 9601(33)....29

CERCLA, 42 U.S.C. § 9620(h)....2

Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, as amended, §§ 2901-11, 104 Stat. 1808, 10 U.S.C. § 2687....2

Section 330 of the National Defense Authorization Act of Fiscal Year 1993, Pub. L. No. 102-484, Div. A, Title III, § 330, 106 Stat. 2371 (Oct. 23, 1992), *amended by* Pub. L. No. 103-60, Div. A., Title X, § 1002, 107 Stat. 1745 (Nov. 30, 1993)....2, 15, 20, 21, 22, 23, 25, 26, 28, 31

40 C.F.R. § 302.4....29

### FEDERAL LEGISLATIVE HISTORY

138 Cong. Rec. S14009....21, 22, 23

139 Cong. Rec. S8433-01 (July 1, 1993)....21

### COLORADO STATE STATUTES AND REGULATIONS

COLO. REV. STAT. § 25-7-115(3)(b)....24

COLO. REV. STAT. § 25-7-122(1)(b)....24

COLO. REV. STAT. § 25-15-309(1)....23, 24

6 CCR 1007-3 Part 101.2(b)....24

### CASES

Adkins v. Commissioner of Internal Revenue, 875 F.2d 137 (7th Cir. 1989)....17

Allstate Ins. Co. v. Adana Mortgage Bankers, Inc., 725 F.2d 1324 (11th Cir. 1984)....17

American International Specialty Lines Insurance Company v. United States, Case No. 05-1020 C, 2008 WL 1990859 (Fed. Cl. 2008)....3, 6

Anderson v. Liberty Lobby, 477 U.S. 242 (1986)....13, 14

Astrium, S.A.S. v. TRW, Inc., 254 F. Supp. 2d 1129 (C.D. Cal. 2003)....26

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)....13, 14

Chambers v. Ohio Dep't of Human Services, 145 F.3d 793 (6th Cir. 1998)....17

Colorado Springs Prod. Credit Ass'n v. Farm Credit Admin., 666 F. Supp. 1475 (D. Colo. 1987)....19

Franklin Sav. Co. v. United States, 56 Fed. Cl. 720 (2003)....15

HOM Flugservice GrvlBH v. Parker Hannifin Corp., 332 F.3d 1025 (6th Cir. 2003)....26

Kawa v. United States, 77 Fed. Cl. 294 (2007)....15

National Railroad Passenger Corp. v. New York City Housing Authority, 819 F. Supp. 1271 (S.D.N.Y. 1993)....29

New London Dev. Corp., 05-2 B.C.A. ¶ 33,018, ASBCA No. 54535 (July 5, 2005)....26, 27

People of Bikini, ex rel. Kili/Bikini/Ejit Local Gov. Council v. United States, 77 Fed. Cl. 744 (2007)....14, 15

Petit v. City of Chicago, 2001 WL 914457 (N.D. Ill. 2001)....18

Richmond American Homes of Colorado, Inc., v. United States, 75 Fed. Cl. 376 (2007)....2, 3, 4, 7, 8, 9, 10, 15, 16, 22, 23, 24, 25, 26, 27, 28, 30, 31

Richmond American Homes of Colorado, Inc., v. United States, 80 Fed. Cl. 656 (2008)....5, 6

Shea v. Reno, 930 F. Supp. 916 (S.D.N.Y. 1996)....18

Stormont-Vail Regional Medical Center v. Bowen, 645 F. Supp. 1182 (D.D.C. 1986)....18

United States v. Butner, 2000 WL 1842410 (W.D. Mo. 2000)....18, 19

United States v. Fleet Factors Corp., 901 F.2d 1550 (11th Cir. 1990)....29, 30

United States v. Mendoza, 464 U.S. 154 (1984)....16, 17

United States v. Nicolet, Inc., 712 F. Supp. 1205 (E.D. Pa. 1989)....................................................30

**RESTATEMENT**

RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. d....................................................................16

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOWRY ECONOMIC REDEVELOPMENT AUTHORITY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Case No. 06-75 C<br><br>Judge Wheeler |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Lowry Economic Redevelopment Authority ("LRA" or "Plaintiff"), by and through its attorneys, Sherman & Howard LLC, hereby files its Brief in Support of Motion for Partial Summary Judgment. For the reasons stated herein, the Court should grant Plaintiff's Motion for Partial Summary Judgment against the Defendant on Plaintiff's First Claim for Relief, "Claim for Indemnification Under Section 330", as stated in Plaintiff's Complaint.

## I. INTRODUCTION AND BACKGROUND

In 1988, Congress established the Defense Base Closure and Realignment Commission, commonly known as the "BRAC Commission." See Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, as amended, §§ 2901-11, 104 Stat. 1808, 10 U.S.C. § 2687 ("BRAC"). The BRAC Commission was required to review existing military bases in the United States and recommend which bases should be closed or realigned and converted to non-military use. Base Closure Act, §§ 2901, 2902. Lowry Air Force Base ("LAFB") in Denver, Colorado, was among those selected for closure and conversion to non-military use. LAFB was an active military installation from 1937 through September 1994.

Richmond American Homes of Colorado, Inc., v. United States, 75 Fed. Cl. 376, 378 (2007) (hereinafter "*Richmond American I*").

Two important Federal ensure that the United States will undertake all actions necessary to investigate and remediate environmental risks at former military installations such as LAFB prior to the transfer of land ownership from the Government to designated economic develop entities for conversion to non-military use. See Section 330 of the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, Div. A, Title III, § 330, 106 Stat. 2371 (Oct. 23, 1992), *amended by* Pub. L. No. 103-60, Div. A, Title V, § 1002, 107 Stat. 1745 (Nov. 30, 1993) (hereinafter "Section 330" or "§ 330"), and Section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9620(h) (hereinafter referred to as "CERCLA § 120(h)"). The broad indemnification provisions of § 330, coupled with certain deed covenant language required by CERCLA, § 120(h), required the United States to remediate environmental contamination on former military installations and provide transferees with broad environmental protections. The Government's indemnification obligations in § 330 are the primary subject of this Motion for Partial Summary Judgment.

The LRA is a legal entity established pursuant to an intergovernmental agreement dated August 1, 1994, between the City and County of Denver, Colorado, and the City of Aurora, Colorado, pursuant to applicable Colorado law. See Economic Development Conveyance Agreement Between the Department of the Air Force and the Lowry Economic Redevelopment Authority (June 30, 1995) ("EDC"), Exhibit 1; see also, *Richmond American I*, 75 Fed. Cl. at 378. As part of the BRAC process, the LRA acquired various parcels of property which had formerly been the LAFB. Id.

The United States, acting by and through the Department of the Air Force ("Air Force"), violated § 330 and CERCLA § 120(h) by transferring numerous parcels of the former LAFB to the LRA without remediating the effects of the pre-closure demolition of buildings containing asbestos and leaving asbestos and asbestos containing materials (collectively "asbestos") in the soils of the transferred parcels. As a result, the LRA incurred substantial costs to investigate, test and remove asbestos in the soil. The LRA submitted requests to the Air Force for indemnification under § 330. The Air Force and the Department of Defense have refused to indemnify the LRA in violation of their obligations under § 330 and CERCLA §120(h). As a result, the LRA brought this action to recover its costs.

## II. RELATED CASES

This action is one of three lawsuits which have been filed in the United States Court of Federal Claims seeking, *inter alia*, relief under § 330 and CERCLA §120(h). The other two cases are *Richmond American I*, cited above, and American International Specialty Lines Insurance Company v. United States, Case No. 05-1020 C, 2008 WL 1990859 (Fed. Cl. 2008) (hereinafter "*AISLIC*").

***Richmond American***

In *Richmond American I*, the five plaintiffs were among a number of developers and builders of residential homes (hereinafter "Builders") who bought improved lots and blocks of lots from the LRA beginning in approximately 2000. *Richmond American I*, 75 Fed. Cl. at 378. Those lots and blocks of lots are located in the northwest corner of the former LAFB which is commonly known as the Northwest Neighborhood (hereinafter "NWN"). Id. The NWN is an area north of 8th Avenue, south of 11th Avenue, west of Uinta Way, and east of Quebec Street, all of which is located in the City and County of Denver. See NWN Map, Exhibit 2.

After the discovery of asbestos in the soils in certain areas of the NWN in 2002, the Colorado Department of Public Health and Environment (hereinafter "CDPHE") issued two Compliance Advisories to the Builders, the LRA, and the Air Force as co-Recipients, on April 24 and April 30, 2003 concerning their activities related to the development and construction of residential properties in the NWN. See CDPHE Compliance Advisories dated April 24 and 30, 2003 (hereinafter "CDPHE Compliance Advisories"), Exhibit 3. As a result of costs incurred by the Builders in complying with the Compliance Advisories and the Air Force's subsequent refusal to indemnify the Builders under § 330 and various deed covenants, the Builders filed an action in this Court. *Richmond American I*, 75 Fed. Cl. 376.

On behalf of the Court, Judge Baskir has issued two opinions in *Richmond American*. The first opinion, *Richmond American I*, was issued on February 22, 2007. Id. *Richmond American I* resulted from the Builders' motion for summary judgment on the two counts in its complaint (i.e. Count I, a § 330 claim for indemnity, and, in the alternative, Count II, a claim for breach of various deed covenants in the deeds which transferred property from the LRA to the individual Builders) and the Air Force's opposing motion to dismiss and motion for summary judgment only on Count I of the Builders' complaint. In *Richmond American I*, the Court acknowledged that the case was one of first impression. The *Richmond American I* decision addressed only the Builders' entitlement to indemnification under its Count I § 330 claim. The Court held that the CDPHE Compliance Advisories satisfied § 330's requirements of a "claim" for "property damage" and there was no evidence that the Builders' contributed to the release of asbestos. Id. at 399. *Richmond I* did not address the Builders' Count II claims for breach of the deed covenants. Id.

After a subsequent trial on the Builders' damages in July 2007, which trial was based on the entitlement decision in *Richmond American I*, Judge Baskir issued a second opinion on March 11, 2008 (hereinafter "*Richmond American II*) which determined the damages to which each of the Builders were individually entitled. Richmond American Homes of Colorado, Inc., v. United States, 80 Fed. Cl. 656 (2008). In addition to finding the Government liable for a significant portion of the damages sought by each of the Builders, the Court's damages decision also denied the Government's Motion for Reconsideration. *Richmond American II*, at 660. In doing so, the Court summarized its earlier decision in *Richmond American I*:

> We concluded that the Defendant's narrow interpretation of Section 330, suggesting that it provided indemnification only for third-party judicially enforceable demands against the Plaintiffs, was inconsistent with the broad terms and statutory purpose of Section 330. *Id.* at 390-91. We found that the CDPHE Compliance Advisories, which required extensive investigation and remediation of the Lowry lots, constituted a "claim" for "property damage" within the meaning of the statute. *Id.* at 392-396. We further determine that Defendant provided no evidence to support its defense of contributory responsibility. *Id.* at 396-98.

Id.

***AISLIC***

In his opinion in *Richmond American II*, Judge Baskir acknowledged that after *Richmond American I* had been issued, "another judge of this Court has since issued an unpublished disposition in the BRAC/Section 330 context in *American International Specialty Lines Insurance Company v. United States*, No. 05-1020C (Fed. Cl. Jan. 31, 2008)("AISLIC")." Id. Judge Baskir addressed the holding in *AISLIC* as follows:

> * * * The factual circumstances are substantially dissimilar to the present case and are not worth going into at this juncture. However, the legal issue is the same. The *AISLIC* Court expressly disagreed with our construction of the statute's indemnity provisions.
>
> Articulating the very same arguments made by the Defendant in this case - we note that Government Counsel was the same in both proceedings - the Court found it unnecessary to consult the legislative backdrop of the indemnification scheme, and held that the plain language of Section 330 provides no cause of action absent a third party

> claim. *AISLIC*, slip op. at 34. According to the decision, "the indemnification claim made by the plaintiff, the Authority, and the City of Alameda to the Navy cannot be a 'claim for personal injury or property damage' because none of those entities is a third party." *id.* at 34-35. The Court found that to hold otherwise "would render the 'settle and defend' language of Section 330© nonsensical." *Id.* at 35.

Id. (typographical error "©" in original).

Before the Court in *AISLIC* were, *inter alia*, claims for indemnity under § 330 as well as multiple claims for the Government's alleged breach of deed covenants, all of which were based on the alleged costs incurred in removing hazardous organic substances from a former Navy installation which had been closed pursuant to BRAC. *AISLIC* at 9. In ruling on the Government's Renewed Motion to Dismiss, for the Court, Judge Sweeney, held that "[a] third-party claim is necessary to obtain indemnification under section 330." Id. at 34. However, when examining the specific facts of the case, Judge Sweeney found there was no third-party claim upon which to base a § 330 indemnity claim. More specifically, the "claim" asserted by the plaintiff in *AISLIC* was a May 3, 2002, letter issued by the Department of Toxic Substance Control ("DTSC Letter") of the California Environmental Protection Agency to the Alameda Reuse and Redevelopment Authority. See DTSC Letter dated May 3, 3002, Exhibit 4. An examination of the DTSC Letter reveals that it is no more than a concurrence with a proposed "Demolition and Organochlorine Pesticide Removal Workplan." After reviewing the letter, Judge Sweeney held that "[b]ecause plaintiff has not identified a third-party claim on which to base its section 330 indemnification claim, the court must dismiss plaintiff's fifth and sixth claims for relief." *AISLIC* at 37.

The foregoing discussion of the *Richmond American I,II* and *AISLIC* decisions is relevant to this Court's determination of Plaintiff's Motion for Partial Summary Judgment since the *Richmond American* decisions addressed virtually identical facts and circumstances associated

with the closure and redevelopment of the former LAFB. Indeed, as discussed below, the CDPHE Compliance Advisories which were in issue in *Richmond American I* are exactly the same Compliance Advisories which the CDPHE issued to the LRA and which are in issue in this action. Accordingly, the LRA urges this Court to examine the Court's decision in *Richmond American I* and grant Plaintiff's Motion for Partial Summary Judgment.

## III. STATEMENT OF RELEVANT FACTS

In *Richmond American I*, Judge Baskir made detailed findings of fact which were based on the parties submissions and Consolidated Statement of Uncontroverted Facts. "Those facts addressed in this part, and in the Discussion that follows, are undisputed, except where otherwise indicated." *Richmond American I* at 378. In view of the limited, but important nature of the Plaintiff's Motion for Partial Summary Judgment, this Statement of Relevant Facts, cites to Judge Baskir's findings where appropriate.

**<u>Asbestos in Soils</u>**

One of the key issues which must be considered in determining whether the LRA is entitled to indemnity under § 330 is the existence of asbestos in soils in the NWN. As discussed below, the relevant documents reflect that the LRA and the Air Force recognized that asbestos existed in the buildings and associated facilities at the former LAFB. There are specific notices by the Air Force to the LRA concerning the presence of Asbestos in buildings and associated facilities. It is the LRA's position, however, that the relevant documents, most all of which were prepared by or for the Air Force, did not put the LRA on notice that the soils contained asbestos.

**<u>Air Force Activities at LAFB</u>**

Prior to its closure as an active military base, the Air Force used the NWN and other portions of the former LAFB to house military personnel. Dormitories and/or barracks buildings

("Housing Facilities") were located in the NWN at one time. Complaint at ¶ 23. A hospital complex comprised of approximately 20 buildings ("Hospital Complex") also was located within the boundaries of the NWN. The Hospital Complex was constructed in or about 1942. Heating for the Hospital Complex was provided by a dedicated steam plant. Complaint at ¶ 24. The Air Force demolished both the Housing Facilities and the Hospital Complex sometime between 1959 and 1979. Complaint at ¶ 25.

During the demolition of the Housing Facilities and the Hospital Complex, Defendant's activities resulted in the release of asbestos, including asbestos-containing insulation and related building debris, to and in the soil in the NWN. Complaint at ¶ 26; see also *Richmond American I* at 382. Air Force demolition activities and associated disposal of asbestos, including, but not limited to those associated with the Housing Facilities and the Hospital Complex, resulted in contamination of the soils in the Northwest Neighborhood and other portions of the LRA Properties with asbestos. Complaint at ¶ 26.

**LAFB Closure and Air Force Pre-Transfer Investigations**

Prior to the closure of LAFB as an active Air Force installation in 1994 and the subsequent transfer of parcels of property by the Air Force for non-military development, the Air Force was required to comply with a number of pre-closure environmental requirements. *Richmond American I* at 378; see also Complaint at ¶¶ 9-11. Those requirements included the Air Force's preparation of an Basewide Environmental Baseline Survey ("EBS") in 1993 which summarized hazardous materials and other regulated areas on LAFB and categorized the various parts of the property accordingly. See Complaint at ¶¶ at 12-13. Among other areas, the EBS characterized the NWN as a Category 1 area (suitable for residential use), indicating an absence

of hazardous substances or petroleum products. *Richmond American I* at 378. In *Richmond American I*, the Court found that:

> * * * Neither party has suggested that the EBS warned of asbestos detected in the soil. As it went about transferring specific parcels of Northwest Neighborhood property, the Air Force issued Supplemental EBS documents. As with the 1993 survey, ***none of these documents identified the presence of ACM in the soil.***

Id. (emphasis supplied).

In addition to the EBS and the various EBS Supplements prepared by the Air Force, the June 1995 Economic Development Conveyance Agreement between the Air Force and the LRA does contain a warning concerning asbestos regarding "building and facilities and equipment that may contain asbestos-containing materials." Id. at 4; see also Complaint at ¶ 15. Judge Baskir, however, specifically found that "[l]ike the baseline survey, the EDC makes no reference to ACM *in the soil*." *Richmond American I* at 379 (emphasis in original).

Prior to the transfers of individual parcels of the former LAFB to the LRA, the Air Force was also required to prepare Findings of Suitability for Transfer (hereinafter "FOST") for each parcel. Id. In *Richmond American I*, the Court described the FOST process:

> * * * The FOST rely heavily on the EBS documentation and, like the EBS, cover every aspect of land management: endangered species protection, wetlands restrictions, historic preservation, and, of course, hazardous substances regulation. The Air Force issued FOST documents each time it transferred to the LRA specific parcels of Northwest Neighborhood property. *See* Compl. at Tab B (FOST, dated Feb. 9, 1999; FOST, dated Aug 2, 2000; FOST, dated Feb. 25, 2002). The documents described the Northwest Neighborhood parcels as suitable for transfer to the Redevelopment Authority without restrictions on the use of the property. FOST (Feb. 25, 2002) at ¶ 1 ("The anticipated use of the Property is community services and residential"). *See also*, FOST (Feb. 9, 1999) at ¶ 1.1 ("[A]nticipated uses include residences, recreation, industrial/storage, medical activities, and a museum"); FOST (Aug. 2, 2000) at ¶ 1.1 ("[A]nticipated uses include rights of way and residential development").

Id. at 379.

Each of the FOSTs listed by the Court contain a table of all of the former Air Force facilities on the property encompassed by the FOST and list any hazardous materials either stored or released on the particular site. Asbestos is not listed in the tables of these FOSTs. The FOSTs do, however, indicate that asbestos was among the "environmental factors considered". Id; Complaint at ¶ 19; see also FOST Priority Areas 6 and 19, Exhibit 5. Most importantly, the FOSTs which, in part, formed the basis for the transfer of Air Force property to the LRA, do not contain any notice of possible contamination of asbestos in the soils of the NWN. *Richmond American I* at 380; see also Deposition of Paul Carroll (May 23, 2007) at Deposition pp. 120-121; 123-124, Exhibit 6; see also Deposition of Charles B. Wright (April 14-15, 2008) at Deposition pp. 112-113, Exhibit 7.

**Transfer and Development of NWN Property**

Following the issuance of each FOST, the Air Force conveyed corresponding parcels of land in the NWN to the LRA. Complaint at ¶ 20. Every deed (including, from time to time, correction deeds) prepared and issued by the Air Force to the LRA ("Deeds") contained certain covenant provisions ("Deed Covenants") in which the Air Force represented that; (i) it had taken all remedial action necessary to protect human health and the environment with respect to hazardous substances; and/or (ii) Defendant was responsible for conducting any future remedial, response, or corrective action (collectively, "cleanup activities") found to be necessary after the date of the transfer. Complaint at ¶ 20; see also Affidavit of Gregory L. Palcanis (June 20, 2008) Exhibit 8.

After the transfer of specific parcels of NWN to the LRA, the LRA and its contractors performed work in the NWN, including rough grading, alignment of new streets and the installation of various utilities in preparation for selling individual finished lots and blocks of

lots to various residential home builders. See Deposition of Tom Berger (April 18, 2008) at Deposition pp. 25-30, Exhibit 9. Thereafter, beginning in 2000, the LRA sold finished lots to residential home builders, including the Builders who are plaintiffs in *Richmond American I.* Complaint at ¶ 21. The Builders constructed residential homes on parcels of land in the NWN and sold individual homes to private individuals. Complaint at ¶ 22.

**Discovery of Asbestos in the NWN and Compliance Advisories**

In 2002, while excavating basements for a residence in the NWN, one of the homebuilders encountered buried construction debris, some of which contained asbestos, in the subsurface soil of the Northwest Neighborhood. Complaint at ¶ 32. The CDPHE was notified of the discovery. Id.

On April 24, 2003, the CDPHE issued a Compliance Advisory to the LRA, the Air Force, and the Builders. See CDPHE Compliance Advisories, Exhibit 3. That Compliance Advisory prohibited "further excavation, grading or other intrusive activities that may result in the disturbance of the soil in the Northwest Neighborhood" and prohibited resumption of work without CDPHE authorization. Id., see also Complaint at ¶ 33. The April 24th Compliance Advisory stated that "the Department believes that present conditions in the Northwest Neighborhood present a threat to public health and the environment." See CDPHE Compliance Advisories, Exhibit 3. In addition, the April 24th Compliance Advisory also required implementation of a comprehensive program of testing, characterizing, and remediating all soil and air in the NWN before construction could resume, through the submission and completion of Emissions Control Plans, Sampling Work Plans, and Response Plans. Id. The CDPHE required the foregoing work in order "[t]o avoid additional enforcement action or reduce the penalties" described in the Compliance Advisory. Id.

CDPHE issued a supplemental Compliance Advisory to the LRA, the Air Force, and the Builders on April 30, 2003, adding a requirement that the Recipients implement a comprehensive indoor air sampling program in the homes and other structures in the NWN. Id.; see also Complaint at ¶ 34.

The CDPHE approved a final indoor air sampling plan on May 21, 2003 (the "Indoor Air Sampling Plan"). Complaint at ¶ 36. CDPHE also approved soil sampling work plans to address the various stages of development on NWN properties, including: (1) Soil Sampling Work Plan for Lots or Areas Where Excavation, Grading or Construction has not been Initiated or Completed, approved July 24, 2003; (2) Soil Sampling Work Plan for Landscaped Lots, approved July 24, 2003; and (3) Soil Sampling Work Plan for Lots where Construction is Complete and Bare Soil Exists, approved May 9, 2003 (the "Soil Sampling Work Plans"). Id.

CDPHE issued a final Response Plan on August 15, 2003. See Complaint at ¶ 37 and Exhibit 5 to Complaint. CDPHE conducted public hearings and received public input on the Response Plan prior to its approval. The Response Plan detailed the procedures and standards for the cleanup of asbestos-contaminated soils. CDPHE concluded that the response actions and cleanup standards required by the Response Plan were protective of the public health and the environment.

As a result of the CDPHE Compliance Advisories, the LRA incurred substantial costs in complying with the various requirements of the Compliance Advisories. Complaint at ¶¶ 46-47.

**Notice and Demand for Indemnity to the Air Force**

The LRA notified the Air Force in writing of its claims for indemnification under § 330 and for breach of the Deed Covenants under CERCLA § 120(h) on numerous occasions, including, but not limited to: December 12, 2002; March 5, 2003; May 28, 2003; June 5, 2003;

August 22, 2003; October 30, 2003; and December 29, 2003 ("Notices). See Complaint at ¶¶ 42-43 and Exhibit 6 to Complaint. The LRA's Notices demanded that the Air Force, among other things, assume the defense, indemnification, and performance obligations required by § 330, various deed covenants and the Compliance Advisories. The LRA furnished the Air Force with copies of relevant papers LRA received, as well as evidence and proof of its claim, losses, and damages. LRA also supplied additional information requested by Defendant relating to LRA's claim. Id.

**Denial of the LRA's Claims**

The Air Force refused to settle LRA's claims for breach of the deed covenants in writing on November 18, 2004, but informed LRA that it had forwarded the LRA's 330 Claim to the Department of Defense ("DOD") for appropriate action. See Complaint at ¶ 44 and Exhibit 7 to Complaint. The DOD issued a final decision denying LRA's § 330 claim in a letter dated December 1, 2005. See Complaint at ¶ 45 and Exhibit 7 to Complaint, attached as Exhibit 10. Thereafter, this action was filed on January 30, 2006.

**4. ARGUMENT**

**A. Summary Judgment Standard**

Summary judgment is not a disfavored procedural shortcut, but an integral part of the rules of procedure designed to secure the just and inexpensive determination of every action. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary judgment is appropriate when, as here, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See R.C.F.C. 56; Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

The moving party need not show an absence of issues of material fact or conclusively negate the opponent's claim for the Court to grant the moving party summary judgment. Instead,

the moving party must only allege an absence of evidence to support the opposing party's case and identify the portions of the record that support granting the summary judgment motion. Celotex, 417 U.S. 317, 322-23. Once the moving party makes this initial showing, the burden shifts to the non-moving party to establish, through admissible evidence, that there are issues of material fact in dispute, and that a real controversy therefore exists. Id.; Anderson, 477 U.S. 242, 250.

The Court should grant summary judgment in favor of Plaintiff on its § 330(a)(1) claim because there are no material facts in dispute. [This needs to be broadened to state the A.F. didn't tell the LRA about ACM in soils. Focusing only on the hospital complex is too narrow.] he Government cannot dispute that the Air Force demolished the barracks and the hospital complex in the Northwest Neighborhood and that the demolition caused ACM to be buried in the soils of the Northwest Neighborhood. The Government also does not dispute that Plaintiff incurred damages in remediating this ACM in the soil to the cleanup standard established by CDPHE. Accordingly, summary judgment is appropriate here in favor of the Plaintiff.

**B. Collateral Estoppel**[1]

**THE GOVERNMENT IS ESTOPPED TO DENY THAT THE COMPLIANCE ADVISORIES ARE "CLAIMS" PURSUANT TO § 330 AND THAT THE COMPLIANCE ADVISORIES ARE CLAIMS FOR "PROPERTY DAMAGE."**

This Court has held that "[i]ssue preclusion, or collateral estoppel, 'bars litigation of an issue if an identical issue was actually litigated and necessarily decided in a prior case where the interests of the party to be precluded were fully represented.'" People of Bikini, ex rel. Kili/Bikini/Ejit Local Gov. Council v. United States, 77 Fed. Cl. 744, 774 (2007) (quoting

[1] Plaintiff understands that the courts now refer to the principle of "collateral estoppel" as "issue preclusion." However, to reduce potential confusion of terms, Plaintiff will refer to "issue preclusion" as "collateral estoppel."

Simmons v. Small Business Admin., 475 F.3d 1372, 1374 (Fed. Cir. 2007)). Collateral estoppel applies when the following elements are established: "(i) the issue previously adjudicated is identical with that now presented, (ii) that issue was 'actually litigated' in the prior case, (iii) the previous determination of that issue was necessary to the end-decision then made, and (iv) the party precluded was fully represented in the prior action." Kawa v. United States, 77 Fed. Cl. 294, 307 (2007). Collateral estoppel serves to "preclude parties from contesting matters they have had a full and fair opportunity to litigate[,] protect[ ] their adversaries from the expense and vexation attending multiple lawsuits, conserve[ ] judicial resources, and foster[ ] reliance on judicial action by minimizing the possibility of inconsistent decisions." Franklin Sav. Co. v. United States, 56 Fed. Cl. 720, 736 (2003).

Section 330 requires a party to establish that; (1) its costs arose from "claims," and (2) those claims were for "personal injury or property damage." See § 330(a)(1). In *Richmond American I,* this Court specifically held:

(1) The CDPHE Compliance Advisories constitute "claims" under § 330(a)(1). See *Richmond American I*, 75 Fed. Cl. 376, 391-93;

(2) If the definition of "claims" requires a "third party claim," CDPHE's involvement constitutes a "third-party claim." See id. at 391; and,

(3) The Compliance Advisories are claims for "property damage" pursuant to § 330(a)(1). See id. at 394-96.

The Government is estopped from asserting that the CDPHE Compliance Advisories do not constitute "claims" pursuant to § 330(a)(1), CDPHE's issuance of the Compliance Advisories does not constitute a "third-party claim," and the Compliance Advisories are not claims for "property damage."

First, this action requires this Court to make the identical determination concerning the Compliance Advisories and CDPHE's involvement which was previously made in *Richmond*

*American I.* Plaintiff argues in this action, similar to the Builders' argument in *Richmond American I*, that the same Compliance Advisories, which applied to Plaintiff, the Builders and the Air Force, constitute "claims" and are claims for "property damage" pursuant to § 330(a)(1).

Second, the three issues identified above were litigated in *Richmond American I.* In *Richmond American*, the Court provided a detailed discussion concerning the history and basis of CDPHE's issuance of the Compliance Advisories and the Plaintiff's, Builder's and Air Force's response. See id. at 383-84.

Third, the Court consideration in *Richmond American I* of the three issues was a necessary part of its determination that § 330(a)(1) was applicable. An issue is essential to the final judgment when "the issue was actually recognized by the parties as important and by the trier as necessary to the first judgment." RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. d. In *Richmond American I*, the Government must have considered the three issues as dispositive since its Brief spent approximately sixteen pages arguing for its position on issues. Finally, the Government was fully represented in *Richmond American I.* Indeed, the Government's attorney in *Richmond American I* is the same attorney representing the Government in this action.

**Collateral Estoppel Applies Against the Government In this Action**

It is anticipated that the Government will argue that collateral estoppel does not apply against the Government based upon United States v. Mendoza, 464 U.S. 154 (1984). While Mendoza does limit the application of non-mutual offensive collateral estoppel[2] against the Government, subsequent federal cases demonstrate that non-mutual offensive collateral estoppel may be applied against the Government under certain circumstances.

---

[2]Non-mutual collateral estoppel occurs where a plaintiff forecloses a defendant from relitigating an issue the defendant previously litigated unsuccessfully in another action against a different party. See Mendoza, 464 U.S. 154, 159 n.3 ("Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party.").

This action presents a circumstance where the application of non-mutual offensive collateral estoppel against the Government is appropriate. Although the United States Supreme Court in United States v. Mendoza, 464 U.S. 154 (1984), held that non-mutual offensive collateral estoppel generally did not apply against the Government, its holding was limited. Specifically the Court concluded its opinion by stating:

> We hold, therefore, that nonmutual offensive collateral estoppel simply does not apply against the government in such a way as to preclude relitigation of **issues such as those involved in this case.**

Id. (emphasis added).

Some courts have interpreted Mendoza as barring all application of non-mutual offensive collateral estoppel against the Government. However, several Federal circuit courts have concluded that non-mutual offensive collateral estoppel may be applied against the Government under certain circumstances. In Adkins v. Commissioner of Internal Revenue, the 7th Circuit concluded that "passages in [Mendoza] leave open the possibility that estoppel may apply against the government with respect to specific fact determinations, not embracing policy choices and legal issues." Adkins v. Commissioner of Internal Revenue, 875 F.2d 137, 141 (7th Cir. 1989). In reaching its conclusion, the 7th Circuit specifically addressed the limitation in Mendoza regarding "**issues such as those involved in this case.**" See id. (quoting Mendoza, 464 U.S. 154, 162) (emphasis in original). The 8th Circuit has also held that "non-mutual issue preclusion is **generally** not available against the federal government." Chambers v. Ohio Department of Human Services, 145 F.3d 793, 801 n.14 (6th Cir. 1998) (emphasis added). Finally, the 11th Circuit has held that "the Supreme Court made plain in Mendoza that doctrines of 'estoppel' cannot be mechanically invoked against the government." Allstate Ins. Co. v. Adana Mortgage Bankers, Inc., 725 F.2d 1324, 1326 (11th Cir. 1984). These decisions do not,

however, completely bar the use of non-mutual offensive collateral estoppel in appropriate circumstances.

Federal district courts also have concluded that non-mutual offensive collateral estoppel may be applied against the Government under certain circumstances. The District Court for the Southern District of New York has held that Mendoza precludes use of non-mutual offensive collateral estoppel against the Government on issues of law. See Shea v. Reno, 930 F. Supp. 916, 924 (S.D.N.Y. 1996). However, "Mendoza leaves open the possibility that nonmutual collateral estoppel may apply against the government with respect to factual issues." Id. The District Court for the District of Columbia has held that "the scope of Mendoza is uncertain." Stormont-Vail Regional Medical Center v. Bowen, 645 F. Supp. 1182, 1192 (D.D.C. 1986). The court, then, permitted application of non-mutual offensive collateral estoppel against the Government. See id. The District Court for the Northern District of Illinois has held that Mendoza is not clear as to the limitations of non-mutual offensive collateral estoppel's application to the Government. See Petit v. City of Chicago, 2001 WL 914457, *6 (N.D. Ill. 2001). Accordingly, "Mendoza likely does not apply to specific fact determinations not embracing policy choices and legal issues." Id.

The District Court for the Western District of Missouri notes that the decision "[w]hether to apply the doctrine of collateral estoppel against the government is decided on a case-by-case basis with an eye toward furthering the policy reasons supporting the doctrine." United States v. Butner, 2000 WL 1842410, *8 (W.D. Mo. 2000). The court also provides the following guidelines concerning the application of non-mutual offensive collateral estoppel against the Government:

> (1) Collateral estoppel is inappropriate in cases involving important constitutional questions, (2) if there is a close alignment in both time and subject matter, collateral

> estoppel is appropriate, and (3) if it is the same issue in essentially the same controversy, collateral estoppel is appropriate.

Id. Ultimately, the court permitted application of non-mutual offensive collateral estoppel against the Government. See id. at *8-9.

The District Court for the District of Colorado provided an in-depth analysis of Mendoza's application in Colorado Springs Prod. Credit Ass'n v. Farm Credit Admin., 666 F. Supp. 1475 (D. Colo. 1987). After examining the holding in Mendoza, the court, then, examined later decisions in which non-mutual offensive collateral estoppel against the Government was permitted. See id. at 1476-77. Based on its analysis, the Colorado District Court concluded that "Mendoza does not posit an absolute rule excluding the use of nonmutual offensive collateral estoppel against the government." Id. at 1478.

In reaching its decision, the Colorado District Court determined that in Mendoza the Supreme Court's ruling was limited, i.e. "nonmutual collateral estoppel would not apply against the government as to **issues such as those involved in that case**." Id. (emphasis in original). The Colorado District Court also determined that the Supreme Court's decision relied upon four distinct policy justifications. See id. The Colorado District Court then concluded:

> These considerations will not apply in all cases in which the government is involved. Clearly there are contexts within which the government litigates just as an ordinary citizen, contexts within which no conceivable political issue or administration policy is at stake, contexts within which the failure to accord full effect to the first, final decision on a point of law does not freeze the development of that issue but rather destabilizes and undermines such development assisting confusion instead of evolution, or contexts within which the issue of appeal will not tax excessively government resources.

Id.

In this case, application of non-mutual offensive collateral estoppel against the Government is appropriate for several reasons. First, this action does not involve constitutional questions. Second, the application of collateral estoppel does not involve political issues or

administration policies. Third, there is a close alignment in both time and subject matter between *Richmond American I* and this action. The § 330 claim asserted by the Builders in *Richmond American I* is virtually identical to the claim asserted by Plaintiff in this action. Compare *Richmond American I* Complaint, Exhibit 11, with Plaintiff's Complaint. Both involve claims for indemnification under § 330(a)(1) for costs incurred as a result of complying with the identical CDPHE's Compliance Advisories. Moreover, applying collateral estoppel here involves only specific factual determinations and does not embrace policy choices or legal issues. Plaintiff only asserts that the Government is estopped from asserting that the Compliance Advisories do not constitute third party claims for property damage pursuant to § 330(a)(1).

### C. Statutory Overview of § 330

Section 330(a)(1) states, in relevant part:

> [T]he Secretary of Defense shall hold harmless, defend, and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance or pollutant or contaminant as a result of [DOD] activities at any military installation (or portion thereof) that is closed pursuant to a base closure law.

See § 330(a)(1).

To establish a right to recovery under § 330(a), Plaintiff must establish: (1) it is a person entitled to recovery under § 330(a)(2); (2) its indemnification claims are for costs arising out of a claim for personal injury or property damage; (3) the claim for personal injury or property damage resulted from or was "in any manner predicated upon, the release or threatened release of any hazardous substance or pollutant or contaminant" on the Properties; and (4) the release or threatened release was a result of Air Force activities at the LAFB. Plaintiff also must show that it complied with the notice requirements of § 330(b).

Senator John McCain, the sponsor of § 330, stated in support of the bill that the United States "simply cannot ask States or businesses to assume potentially devastating liability for conditions they did not create. Moreover, the Federal Government has a duty to accept full and unconditional responsibility for its actions . . .." See 138 Cong. Rec. S14009 (Sept. 19, 1992, statement of Senator John McCain) (emphasis added).

Throughout the legislative process surrounding § 330, the Department of Defense ("DOD") consistently opposed § 330, as it recognized the potentially significant fiscal impact of § 330 claims. See 139 Cong. Rec. S8433-01 (July 1, 1993) (Letter from Assistant Secretary of Defense Berteau to Sen. McCain). In a letter written during the United States Senate's consideration of § 330, the Assistant Secretary of Defense admitted that § 330 effectively eliminated defenses and limitations to DOD's liability and involved a "wholesale shift of all risks" to DOD. See id. Congress enacted § 330 despite DOD's concerns, and it is against this legislative backdrop that the plain language of § 330, if deemed ambiguous or subject to judicial review of Congressional intent, must be evaluated.

### D. Plaintiff is Entitled to Indemnity under the Provisions of Section 330.

#### 1. PLAINTIFF IS A QUALIFIED ENTITY UNDER § 330(A)(2)(D)

§ 330(a)(2)(D) defines a qualified person as "[a]ny successor, assignee, or transferee of a person that acquired ownership or control of property at a former military installation." See § 330(a)(2)(D). Plaintiff clearly falls within this definition because it acquired ownership of the Northwest Neighborhood from the Air Force. The Government cannot dispute that Plaintiff is a qualified entity under § 330(a)(2)(D).

### 2. PLAINTIFF SEEKS INDEMNIFICATION FROM AND AGAINST A SUIT, CLAIM, DEMAND OR ACTION, LIABILITY, JUDGMENT, COST, OR OTHER FEES ARISING OUT OF A CLAIM FOR PROPERTY DAMAGE.

§ 330(a)(1) also requires Plaintiff to make a two-part showing: (1) its costs arose from "claims" and, (2) those claims were for "personal injury or property damage." The Compliance Advisories are the regulatory claims and demands resulting in Plaintiff's costs. Accordingly, they fulfill both of these requirements.

#### a. The Compliance Advisories Constitute "Claims" Pursuant to §330(a)(1).

§ 330(a)(1) requires indemnification for "any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage." See § 330(a)(1). The statute, however, does not define "claim." See *Richmond American I*, 75 Fed. Cl. 376, 389. The legislative history for §330, however, confirms that a "claim" includes both regulatory and civil actions. In discussing the purposes of §330, Senator McCain specifically stated:

> Under current law, receivers of closed base property can be successfully sued for pollution caused by [DOD] activities. Such suits might include **environmental cleanup orders or civil damage claims**. . .. [T]he Federal Government has duty to accept full and unconditional responsibility for its actions.

See 138 Cong. Rec. S14009 (September 18, 1992) (Statement of Sen. McCain) (emphasis added). The fact that a "claim" covers both regulatory and civil actions fits with the sweeping protections of §330(a)(1). See *Richmond American I*, 75 Fed. Cl. 376, 390 (finding that "[t]he protections of §330(a)(1) are sweeping"). Furthermore, "[Section 330] is applied broadly, providing for indemnification from and against 'any suit, claim, demand or action, liability, judgment, cost or other fee.'" Id. (quoting §330(a)(1)).

Section 330(a)(1) provides that the Government shall indemnify transferees for "any claim for personal injury or property damage," and contains a lengthy list of indemnified events including "any suit, claim, demand or action, liability, judgment, cost or other fee." See §330(a). There are no restrictions or qualifiers on the term "claim," including any restriction concerning regulatory and civil actions.

A "claim" under Section 330 does not need to involve a "third-party legal action." The plain and ordinary language of Section 330(a)(1) does not require a transferee to demonstrate the existence of a "third-party legal action" to satisfy the requirement of a "claim." In *Richmond American I*, the Court specifically rejected the notion that "a 'third party claim' is required for application of Section 330(a)(1)." *Richmond American I*, 75 Fed. Cl. 376, 391.

Limiting a "claim" to a "third-party legal action" would undermine the stated purpose of § 330 to "help facilitate a safe and timely transfer of base property to other productive uses." See 138 Cong. Rec. S14009 (September 18, 1992) (Statement of Sen. McCain). Senator McCain argued that "[the Government] cannot possibly achieve that goal if those who would put that property to use must risk everything in the process." See id.

While Plaintiff believes that the Government is estopped from asserting that the Compliance Advisories are not "claims" pursuant to § 330(a)(1), even if the Court determines the Government is not estopped, the Compliance Advisories remain "claims" pursuant to § 330(a)(1).

The CDPHE Compliance Advisories were not advisory invitations to voluntary action. Colorado statutes and regulations authorize CDPHE to assess administrative penalties against persons who violate environmental laws. Pursuant to COLO. REV. STAT. § 25-15-309, any person who violates COLO. REV. STAT. § 25-15-308 "shall, for each such violation, be subject to a

penalty for each day during which such violation occurs or continues." See COLO. REV. STAT. § 25-15-309(1); see also 6 CCR 1007-3 Part 101.2(b). CDPHE may impose a penalty of up to $15,000 per day for each violation. See COLO. REV. STAT. § 25-15-309(1); see also 6 CCR 1007-3 Part 101.2(b). Pursuant to COLO. REV. STAT. §§ 25-7-115(3)(b) and 25-7-122(1)(b), CDPHE also could assess a penalty of up to $15,000 per day for each violation of the Air Quality Control Act. See COLO. REV. STAT. §§ 25-7-115(3)(b) and 25-7-122(1)(b). The Compliance Advisories specifically identify the applicable Colorado statutes and regulations providing for monetary penalties. See Compliance Advisories, Exhibit 3.

The CDPHE Compliance Advisories were also not idle inquiries to the recipients. The CDPHE informed Plaintiff that "[t]he issuance of this Compliance Advisory does not limit or preclude the Department from pursuing its enforcement options . . . including issuance of a Compliance Order and assessment of penalties." Id. The Compliance Advisories essentially meant that Plaintiff and the Builders "will have to pay eventually." *Richmond American I*, 75 Fed. Cl. 376, 392. The *Richmond American I* Court specifically found that "[t]he text of the two Compliance Advisories . . . shows that the State of Colorado was not making an idly inquiry." Id.

The Compliance Advisories placed the burden on Plaintiff and the Builders to take remedial efforts or demonstrate that no violations occurred. They state, in relevant part:

> To avoid additional enforcement action or reduce the penalties described above, you must either correct the deficiencies as outlined below, or you must demonstrate to the Department that the deficiencies are not violations of Colorado hazardous waste and/or air laws.

Id. The Compliance Advisories also contained the following warning, "Failure to respond in a timely fashion to this Compliance Advisory will be considered in any subsequent enforcement action and the assessment of administrative and/or civil penalties." Id. In *Richmond American I*,

the Court found and confirmed that the Compliance Advisories squarely placed the burden upon Plaintiff and the Builders to take remedial efforts or demonstrate that no violations occurred. See *Richmond American I*, 75 Fed. Cl. 376, 393. Finally, Plaintiff was not required to wait for a potential CPDHE Compliance Order, (the next step in the CDPHE compliance process) to trigger the protections of § 330(a)(1). In *Richmond American I*, the Court specifically found that there was "no substantive difference between [the compliance advisories and compliance orders]." Id. at 392.

The CDPHE Compliance Advisories qualify as a "third-party legal action" under § 330 since the CDPHE is unrelated in any manner to either the Plaintiff, the Builders or any agency of the Federal Government. In *Richmond American I*, the Court specifically found that CDPHE's involvement to be a third-party claim. The Court emphatically stated:

> We reject the notion that a "third party claim" is required for application of Section 330(a)(1). But even assuming such a requirement, we have no trouble reading the CDPHE's involvement as a third party claim. * * *

Id. at 391.

**b. The Compliance Advisories are Claims for "Property Damage" Pursuant to Section 330(a)(1).**

Section 330(a)(1) provides for indemnification under the following circumstances:

> [A]ny suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (**including death, illness, or loss of or damage to property or economic loss**) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance, pollutant or contaminant.

See § 330(a)(1) (emphases added). "Property damage" under § 330(a)(1) includes both "loss of or damage to property or economic loss."

Section 330(a)(1) does not define "economic loss." Black's Law Dictionary, however, defines "economic loss" as "[a] monetary loss such as lost wages or lost profits." BLACK'S LAW

DICTIONARY 552 (8th ed. 2004). Courts have defined "economic loss" broadly to include consequential damages, lost profits, lost opportunities, costs of repair and replacement, loss of use, and loss of good will. See HOM Flugservice GrvlBH v. Parker Hannifin Corp., 332 F.3d 1025, 1028 (6th Cir. 2003); Astrium, S.A.S. v. TRW, Inc., 254 F. Supp. 2d 1129, 1139 (C.D. Cal. 2003). In the context of property damage, the Armed Services Board of Contract Appeals ("ASBCA") found that "economic loss" included the "costs of repair and replacement of the defective product or defective property." See New London Dev. Corp., 05-2 B.C.A. ¶ 33,018, ASBCA No. 54535 (July 5, 2005)(citing Trans States Airlines v. Pratt & Whitney Canada, 130 F.3d 290, 291 (7th Cir. 1997) and R.W. Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818, 829 n.22 (11th Cir. 1983)). In *Richmond American I*, the Court found the ASBCA's reasoning in New London Dev. Corp. to be persuasive. See *Richmond American I*, 75 Fed. Cl. 376, 394.

When enacting § 330(a)(1), Congress did not limit the types of "property damage" and in *Richmond American I*, the Court reached an identical conclusion. "[T]he language 'loss of or damage to property or economic loss' encompasses a variety of possible damage theories." Id.

Indemnification under § 330(a)(1) may be premised upon both "**the release or threatened release** of any hazardous substance, pollutant or contaminant." See § 330(a)(1) (emphases added). Accordingly, § 330(a)(1) contemplates indemnification for necessary preventative measures. In *Richmond American I*, the Court, again, reached an identical conclusion. See *Richmond American I*, 75 Fed. Cl. 376, 394.

As discussed above, in *Richmond American I*, the Court addressed the issue of Government indemnification for the costs of removing undisclosed ACM on BRAC property. After examining § 330 and Compliance Advisories, the Court concluded that the Compliance Advisories constituted claims for "property damage" pursuant to § 330. Id. at 394-96.

Specifically, the Court found that "necessary preventative measures such as the response actions directed by the CDPHE in this case, are contemplated by this legislation." Id. at 394.

In *Richmond American I*, the Court discussed the ASBCA's New London Dev. Corp. decision which also had addressed Government indemnification for costs incurred in removing undisclosed ACM on BRAC property. See New London Dev. Corp., 05-2 B.C.A. ¶ 33,018, ASBCA No. 54535 (July 5, 2005). The appellant claim against the Government was not based upon § 330, but on an indemnification provision in a lease that referenced § 330's statutory requirements and incorporated the precise indemnification language in § 330. Id. The ASBCA found that costs incurred by the appellant for monitoring, removing, and disposing of ACM could constitute a claim for property damage within the contractual indemnification. Id. The *Richmond American I* Court agreed with the reasoning of the ASBCA. See *Richmond American I*, 75 Fed. Cl. 376, 394.

While the Plaintiff urges this Court to find that the Government is estopped from asserting that the Compliance Advisories are not claims for "property damage" pursuant to § 330(a)(1) based on *Richmond American I*, this Court itself should find that the Compliance Advisories are claims for "property damage" pursuant to § 330(a)(1).

The Compliance Advisories state that the contamination with asbestos and ACM in the Northwest Neighborhood "presents a threat to public health and the environment." See Compliance Advisories, Exhibit 3. The necessary consequence of the CDPHE Compliance Advisories required the Plaintiff to incur substantial costs which qualify as an "economic loss." While Plaintiff recognizes that the Government may question the amount of the Plaintiff's incurred costs, there can be no dispute that Plaintiff incurred at least some costs as a direct consequence of the CDPHE Compliance Advisories.

### 3. THE CLAIMS RESULTED FROM THE RELEASE OR THREATENED RELEASE OF A HAZARDOUS SUBSTANCE, POLLUTANT, OR CONTAMINANT AS A RESULT OF DEFENDANT'S ACTIVITIES.

To qualify for indemnification under § 330(a)(1), Plaintiff must demonstrate that CDPHE's Compliance Advisories resulted from "the release or threatened release of any hazardous substance, pollutant or contaminant . . . as a result of Department of Defense activities. . .." See § 330(a)(1). CDPHE's Compliance Advisories were issued as a direct result of either the release or threatened from the release of ACM in the soils in the NWN. There is virtually no doubt that release or threatened release resulted from almost 60 years of Air Force activities at the former LAFB and specifically activities in the NWN.

In *Richmond American I*, the Court specifically addressed the original source of the ACM in the NWN:

> From what we have gleaned from the papers, the presence of ACM in the soil is not particularly surprising given the historical records of the base. The Northwest Neighborhood sector of Lowry Air Force Base once included barracks and a large medical facility constructed in 1942. Like the existing buildings on the base ACM was likely used in their construction. Furthermore, these structures were demolished sometime between 1959 and 1979, well before the dangers of asbestos were known and the substance regulated. Consequently, there would have been no reason to suspect that any special care had been taken in disposing of the remnants of those buildings. A number of Government sources, including a study commissioned by the Air Force have surmised that debris contaminated with asbestos remained buried in the footprint of the demolished facilities. See e.g., RCRA Facility Assessment Report, Air Force Real Property Agency (Jan.2005); Pls.App., 0107.

*Richmond American I*, 75 Fed. Cl. 376, 382.

The Air Force's demolition of buildings which contained ACM prior to the closure of the former LAFB in 1994 constituted a "release." Section 330(f) adopts the CERCLA definition of "release." CERCLA broadly defines "release" as to include "any spilling ...emptying, discharging . . . escaping, leaching, dumping or disposing into the environment (including the

abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." See 42 U.S.C. § 9601(22). In addition to actual releases, § 330(a)(1) also covers damages arising from "threatened release," and thus contemplates recovery for damages incurred to prevent or mitigate liability for future releases. The Air Force's disposal and abandonment of ACM resulting from the demolition of former Air Force buildings in the Northwest Neighborhood clearly falls within CERCLA's inclusive definition of "release" which is incorporated in § 330. See National Railroad Passenger Corp. v. New York City Housing Authority, 819 F. Supp. 1271 (S.D.N.Y. 1993) (finding that a railroad could sue adjacent building owner because a release of a hazardous substance occurred under CERCLA when ACM fell from a building's support pillars onto railroad tracks below the building).

Asbestos is a "hazardous substance, pollutant or contaminant." Asbestos is expressly included within the scope of "hazardous substance" under CERCLA. See 42 U.S.C. § 9601(14)(A) (including within the definition any substance specifically designated as hazardous under CERCLA); 40 C.F.R. § 302.4 (designating asbestos as a hazardous substance under CERCLA). Asbestos and ACM also fall within the broader definition of a "pollutant" or a "contaminant" under CERCLA since asbestos is a known carcinogen. See 42 U.S.C. § 9601(33) (defining "pollutant or contaminant" to include "any element, substance, compound or mixture, . . . , which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism . . . will or may reasonable be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions . . . or physical deformations; in such organisms or their offspring . . .."); see also United States v. Fleet Factors

Corp., 901 F.2d 1550 (11th Cir. 1990) (asbestos is hazardous substance covered by CERCLA); United States v. Nicolet, Inc., 712 F. Supp. 1205, 1207 (E.D. Pa. 1989) (same).

CDPHE issued the Compliance Advisories as a result of the release of ACM asbestos on the Properties. The Compliance Advisories stated that ". . . present conditions in the Northwest Neighborhood present a threat to public health and the environment." See Compliance Advisories, Exhibit 3. The CDPHE required Plaintiff, the Builders and the Air Force to halt all excavation activities in the NWN, to develop and implement plans to minimize the future emissions of asbestos, to sample and characterize the nature and extent of asbestos contamination in the soils, and to respond to and eliminate potential current and future exposure of people and the environment to asbestos. Id.

The Air Force liability to indemnify the Plaintiff under § 330 is clear. When the Air Force transferred NWN parcels to Plaintiff, all parties involved with the conversion of the former LAFB to non-military uses anticipated the development activities carried out by Plaintiff and the Builders in the NWN. This is evidenced by the fact that the FOSTs which authorized transfers of NWN parcels to Plaintiff contained no restrictions on residential use. See FOST, Exhibit 5. The Court in *Richmond Homes I* found that "[t]he Lowry conveyances were premised on the BRAC goal of putting former military property to productive uses the transformation of the base to residential communities." *Richmond Homes I*, 75 Fed. Cl. 376, 398.

Finally, the Court in *Richmond Homes I* found that "evidence suggesting that DoD-introduced asbestos may have been inadvertently brought to the surface by the redevelopment project does not diminish the Governments liability." Id. The Court found "no distinction between the Government's responsibility for creating the threat and the Government's obligations once the threat was discovered through residential development of the former base."

Id. at 399. Here, the Air Force cannot escape liability for ACM in the NWN soils by attempting to show that Plaintiff inadvertently brought asbestos, if any, to the surface through its redevelopment efforts.

### 4. PLAINTIFF SATISFIED THE PROCEDURAL REQUIREMENTS OF § 330(B)

Section 330(b) requires parties seeking indemnification to (1) notify the DOD in writing within two years after their claim accrues, (2) furnish copies of any pertinent papers received, (3) furnish evidence of proof of any claims, and (4) provide access to their reports and personnel for purposes of defending or settling the claim or action. See § 330(b). As set forth in the Statement of Facts above, Plaintiff notified the Air Force within five months after the discovery of asbestos in soil in the NWN, provided the Air Force with detailed information to support its claims, and provided all additionally requested material. The DOD denied Plaintiff's indemnity claim under § 330 December 1, 2005. See Exhibit 10. The LRA filed this action on January 30, 2006.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court to grant its Motion for Partial Summary Judgment.

Respectfully submitted this 20th day of June, 2008.

SHERMAN & HOWARD L.L.C.

By: s/ Durward E. Timmons
Durward E. Timmons
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO 80903
Phone: (719) 475-2440
Fax: (719) 635-4576

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 20th day of June, 2008, a true and correct copy of **PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** was filed electronically and served on the following party. Service is complete upon filing, and parties may access this filing through the Court's system.

Kyle Eric Chadwick
U.S. Department of Justice
Civil Div. – Commercial Litigation Br.
1100 L Street, NW, 8th Floor
Washington, DC 20530
kyle.chadwick@usdoj.gov

s/ Durward E. Timmons